# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1078-6 | **DATE** | January 20, 2004 |
| **CASE TITLE** | *United States v. Cortez Cooper* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons set forth in the attached Memorandum and Order, the Court OVERRULES in part and SUSTAINS in part Cooper's Objections [349-1].  It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | |
| | No notices required. | | number of notices | | | |
| ✓ | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | JAN 22 2004 | | | |
| | Docketing to mail notices. | | date docketed | | | |
| | Mail AO 450 form. | | docketing deputy initials | | 369 | |
| | Copy to judge/magistrate judge. | | | | | |
| RTS | courtroom deputy's initials | | date mailed notice | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )    Hon. Blanche M. Manning
           v.                )
                             )    01 CR 1078-6
CORTEZ COOPER                )
                             )

## MEMORANDUM AND ORDER

This matter comes before the Court on the sentencing of Defendant Cortez Cooper, who entered a "blind plea" to two counts of knowingly and intentionally possessing with intent to distribute cocaine and cocaine base, in violation of 18 U.S.C. § 841(a)(1). Currently before the Court are Cooper's Objections to the Presentence Investigation Report ("PSR"), prepared by the United States Probation Office ("Probation"). For the reasons that follow, the Court OVERRULES in part and SUSTAINS in part Cooper's Objections.

### BACKGROUND[1]

### A.    The Initial Indictment

Cooper and his ten Co-Defendants were charged in a 39-count Initial Indictment, which alleged that they conspired to distribute cocaine and cocaine base in the Garfield Boulevard area on the south side of Chicago from 1992 until their arrest in 2001. In addition to the conspiracy count (Count 1), the Initial Indictment named Cooper in five separate counts – Counts 12-16. Counts 12 and 13 allege that on May 1, 2001, Cooper knowingly and intentionally possessed with the intent to distribute 62 grams of cocaine and 9.2 grams of cocaine base, in violation of 18 U.S.C. § 841(a)(1). Counts 14 and 15 allege that on December 12, 2001, Cooper knowingly and

---

[1] The facts in the Background section are taken from the PSR, the parties' submissions and documents attached thereto, and evidence presented at the sentencing hearing.

369

intentionally possessed with the intent to distribute 32 grams of cocaine base and 111 grams of marijuana, in violation of 18 U.S.C. § 841(a)(1). Count 16 alleges that Cooper knowingly and intentionally used a telephone in the commission of a felony, in violation of 21 U.S.C. § 843(b).

## B. Cooper's Proffer

On February 14, 2002, pursuant to a proffer agreement ("the Proffer Agreement"), the Assistant United States Attorney and the FBI special agent, working this case, interviewed Cooper, while he was in custody. The Proffer Agreement specifically stated that:

> [i]n the event that [Cooper] is subsequently charged with criminal wrongdoing, anything related to the government by your client during the proffer cannot and will not be used against your client, Cortez Cooper, in the government's case-in-chief, or in aggravation of your client's sentence pursuant to Sentencing Guideline Section 1B1.1.

(Cooper's Objections, Ex. C.) However, the Proffer Agreement also set out that:

> [t]he government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against your client in subsequent proceedings. Furthermore, if your client should subsequently testify contrary to the substance of the proffer, or otherwise present a position inconsistent with the proffer, nothing shall prevent the government from using the substance of the proffer [] at sentencing for any purpose. . . .

(Id.)

During his proffer session, Cooper stated that he first met Co-Defendant Hugh Rogers, the leader and organizer of the conspiracy charged in the Indictment, in grade school. (Cooper's Objections, Ex. D.) Not until 1995, however, did they begin to sell drugs together. According to Cooper, "[o]n approximately three occasions during 1995 through 1997, Cooper and Rogers pooled their money to purchase cocaine." During one occasion, the two purchased an eighth of a kilogram of powder cocaine. The other two transactions were for "either two and one quarter

ounces or one eighth of a kilogram of powder cocaine, which were subsequently cooked into crack cocaine."

After these three transactions, Cooper and Rogers did not conduct any drug transactions until April of 2001, when Cooper began delivering cocaine for Rogers, in exchange for $500 a week. On two occasions, Cooper delivered two and one quarter ounces of cocaine to Co-Defendant David Coats. On four other occasions, Cooper delivered between two and one quarter ounces up to four and one half ounces of cocaine to Co-Defendant Ravon Bailey. Cooper also delivered two and one quarter ounces of cocaine to Co-Defendant Theatric Bailey. Additionally, Cooper was present with Rogers at his residence when Roger sold cocaine to Co-Defendants Jeremiah Smith and Bailey.

In May of 2001, Cooper was arrested while attempting to deliver two and one quarter ounces cocaine to Co-Defendant Coats. After being released in August of 2001, Cooper contends that, although he continued to purchase and sell cocaine, he did not have any further drug dealings with Rogers or any other Co-Defendant.

### C.    Rogers' Proffers

The Government also received a detailed proffer from Rogers. The Government interviewed Rogers on at least eight occasions, both before and after Cooper's proffer. The Government initially interviewed Rogers several times between January and March of 2002. In his initial proffer, Rogers gave a long and detailed description of his drug operation from 1991 to 2001. His initial summary of the alleged conspiracy, however, only makes brief reference to Cooper. According to Rogers, when he was released from jail in the summer of 1997, he gave Cooper an ounce of cocaine to sell for him. Cooper, however, never paid Rogers back the money

-3-

which he was owed for the cocaine. The two apparently did not have any further dealings until April of 2001, when Rogers gave Cooper an ounce of crack to sell for him. As before, however, Cooper never paid Rogers any money. To deal with Cooper's debt, Rogers alleges that Cooper agreed to deliver cocaine to Rogers' customers. According to Rogers, Cooper delivered cocaine for Rogers on "approximately five occasions." One of these occasions included the May 1, 2001 delivery to Co-Defendant Coats for which Cooper was arrested and to which he pled guilty in Counts 12 and 13. After Cooper's arrest and release from custody in August of 2001, Rogers alleges that his sole contact with Cooper was the sale of one-half ounce of crack.

Other than the one ounce deal in August of 1997, Rogers did not mention any other dealings with Cooper before 1997. Not until a March 28, 2003 interview, did Rogers implicate Cooper in his drug dealing activities before 1997. Rogers stated that in the second half of 1994, on "approximately five occasions," he sold Cooper between an eighth and one-half ounces of crack. During 1996, Rogers allegedly sold Cooper crack in "half ounce quantities . . . and occasionally . . . one eighth ounce amounts." Rogers then went on to state the same story as in the other interviews about giving Cooper one ounce of cocaine in May of 1997.

As in the prior interviews, Rogers then stated that there was no dealing between him and Cooper until April of 2001, at which time Rogers gave Cooper an ounce of crack to sell for him. In contrast to his prior interview, this time, Rogers stated that Cooper paid him $300 and agreed to "pay back the $500," for the rest of the one ounce of crack "by delivering cocaine for Rogers to various customers." According to Rogers, Cooper delivered cocaine to customers on "approximately" six occasions. Rogers also stated for the first time in this interview that Cooper

-4-

accompanied him when he made cocaine deliveries and that Cooper was present when he "cooked powder cocaine into crack cocaine."

### D. The Government's Proposed Plea Agreement and Cooper's Blind Plea

After Cooper's proffer session, the Government tendered a signed plea agreement ("the Plea Agreement") to Cooper. (Cooper's Objections, Ex. E.) The Plea Agreement required Cooper to plead guilty to "one count of conspiracy to distribute and possess with intent to distribute quantities . . . in excess of five kilograms of cocaine and in excess of 50 grams of cocaine base" and three counts of possession with intent to distribute cocaine and cocaine base and one count of possession with intent to distribute marijuana. In pleading guilty to the conspiracy count, the Plea Agreement required Cooper to admit: (1) criminal conduct from his proffer session; and (2) participation in Roger's drug conspiracy from at least 1995 until December of 2001. The Plea Agreement also required Cooper to admit that by participating in this conspiracy, "it was reasonably foreseeable to him that the conspiracy distributed more than 50 but fewer than 150 kilograms of cocaine, and more than 1.5 kilograms of crack cocaine." Although not setting forth a specific sentence, the Plea Agreement stated that Cooper's minimum sentence would be no less than 10 years. The Plea Agreement also stated that at the time of sentencing, the Government would move for a downward departure under United States Sentencing Guideline ("the Guideline" or "U.S.S.G.") section 5K1.1 and 18 U.S.C. § 3553(e), which would result in a sentence equal to two-thirds of the low end of applicable Guideline or the 10 year statutory minimum sentence. Cooper rejected the Plea Agreement on the ground that he did not believe that he was a part of the Roger's conspiracy from 1995 to 2001.

After rejecting the Plea Agreement, on April 3, 2003, Cooper entered a "blind plea" to Counts 12 and 13, which allege that on May 1, 2001, Cooper knowingly and intentionally possessed with the intent to distribute 62 grams of cocaine and 9.2 grams of cocaine base, in violation of 18 U.S.C. § 841(a)(1).

### E.     Superceding Indictment

On April 17, 2003, two weeks after his blind plea, a six-count Superceding Indictment was returned solely against Cooper.[2]  Count 1 of the Superceding Indictment charged that Cooper conspired with former Co-Defendants Rogers, Clark, Bailey, Coats, and others, to knowingly and intentionally distribute and possess with intent to distribute in excess of five kilograms of cocaine powder and in excess of 50 grams of cocaine base.  On May 1, 2003, Cooper entered a plea of not guilty to the Superceding Indictment.

### F.     Cooper's PSR

After Cooper pled guilty to Counts 12 and 13 of the Initial Indictment, Probation calculated his total offense level, using the 2001 edition of the Guidelines, as follows:

| | |
|---|---|
| Base Offense Level (§ 2D1.1(c)) (26 levels based on the quantity of drugs in Counts 12 and 13 and 12 levels based on other relevant conduct, pursuant to § 1B1.3) | 38 |
| Specific Offense Characteristics (for possession of a firearm pursuant to § 2D1.1(b)(1)) | 2 |
| Adjustment for of Role in Offense (§ 3B1.2(b)) | 0 |

---

[2]     At the time of the Superceding Indictment, Cooper was the only remaining Defendant who had not entered a plea disposing of all charges.

(minor participant)

Acceptance for Responsibility (§ 3E1.1)      0

Total Offense Level                          40

Additionally, Probation calculated Cooper's "Criminal History Category" at a III. Based on an offense level of 40 and a criminal history category of III, the Guidelines provide for a sentence of 360 months to life.

## ANALYSIS

Cooper contends that Probation erred in: (I) assigning him an additional 12 levels for other relevant conduct; (II) adding an additional two levels for possession of a dangerous weapon; (III) refusing to give him a minor role reduction; and (IV) denying him credit for acceptance of responsibility. The Court will discuss each of these contentions in turn.[3]

## I.      Other Relevant Conduct

Probation asserts that Cooper's base offense level should be increased by 12 levels under Guideline section 1B1.3, for "other relevant conduct" not charged in the counts he pled guilty. Although Probation does not cite to a specific subsection of section 1B1.3, it appears to rely upon subsections (a)(1)(b) and (a)(2). Consequently, the Court will discuss the standards involved in applying each of these subsections. First, however, the Court will examine whether the evidence which Probation relied upon was properly taken into consideration.

---

[3]      At the sentencing hearing, this Court overruled the objections on the dangerous weapon and the minor role and took the objections to relevant conduct and acceptance of responsibility under advisement. Although ruled on, the Court will nevertheless briefly address the dangerous weapon and minor role objections.

-7-

## A.  Evidence Alleged to Constitute Other Relevant Conduct

In determining that Cooper should be given an additional 12 levels for "other relevant conduct," Probation's investigation was limited to reviewing statements made by Rogers and a discussion with the FBI case agent. Based on this investigation, Probation found the following actions "directly" attributable to Cooper: (1) purchasing "between 1/8 and 1/2 ounce quantities of crack cocaine" from Rogers on "approximately five occasions" in 1994; (2) buying "between 1/8 and 1/2 ounce quantities of crack cocaine" from Rogers in late spring of 1996; (3) being "fronted" (i.e., given) one ounce of cocaine in 1997 and one ounce of crack cocaine in April of 2001; and (4) delivering cocaine for Rogers to Co-Defendants Bailey and Coats "on at least six occasions in 2001."

Probation also determined "that other drug transactions conducted by members of the conspiracy were reasonably foreseeable to the defendant, such that, when taken in conjunction with the defendant's own direct relevant conduct, the base offense level in this case should be a 38."[4] In support of this conclusion, Probation cites to the fact that Cooper "was present with Hugh Rogers when Rogers made deliveries to other customers, and was present in Rogers' apartment on several occasions while Rogers cooked powder cocaine into crack cocaine for the purpose of distribution."

Cooper contends that Probation should not even have considered the above information because it stems directly from his proffer and therefore, protected by his Proffer Agreement. Cooper is correct in that his Proffer Agreement specifically stated that "anything related to the

---

4       Although Probation did not explicitly make its calculations in the PSR, to increase Cooper's base offense level from a 26 to a 38 under the Guidelines, Cooper would have to be held accountable for at least 150 kilograms of cocaine and/or 1.5 kilograms of crack.

-8-

government by your client during the proffer cannot and will not be used against your client, Cortez Cooper . . . in aggravation of your client's sentence. (Cooper's Objections, Ex. C.) However, as the Government correctly points out, the Proffer Agreement also stated that "[t]he government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against your client in subsequent proceedings." (Id.)

At the sentencing hearing, the Government unequivocally stated that neither the United States Attorney's office nor the FBI revealed the contents of Cooper's proffer to any witnesses, including Rogers. Instead, the Government contends that Roger's statements implicating Cooper were the result of independent investigation. Because the Court has no reason to disbelieve the veracity of this statement, the Court will not ignore the other relevant conduct evidence in the PSR. This ruling, however, as explained below, does not affect the Court's findings of fact.

**B.    Other Relevant Conduct**

Under section 1B1.3(a)(2), the sentencing court is required to increase the defendant's base offense level to account for all "relevant conduct," which includes "all acts and omissions" committed by the defendant that are "part of the same course of conduct or common scheme or plan as the offense of conviction." (Emphasis added.) This "related conduct" or "aggregation rule" requires that the sentencing court "consider quantities of drugs not specified in the counts of conviction," United States v. Bacallo, 149 F.3d 717, 719 (7th Cir. 1998), and even permits the court to consider "related conduct, whether it [was] charged or not." United States v. Petty, 132 F.3d 373, 381 (7th Cir. 1997). The rule also allows courts to consider drug transactions which

predated the transactions for which the defendant was convicted. <u>United States v. Zehm</u>, 217 F.3d 506, 512 (7th Cir. 2000).

The Seventh Circuit has noted that "[i]t is rather obvious that the aggregation rule grants the government a fearsome tool in drug cases." <u>United States v. Duarte</u>, 950 F.2d 1255, 1263 (7th Cir. 1992). Under this rule, the government may indict a defendant on relatively minor charges, only to seek an enhanced sentence for charges which the defendant has either not been indicted for or not convicted.[5] <u>Id.</u> The rule, however, is not without limits. <u>Id.</u> "The mere fact that the defendant has engaged in other drug transactions is not sufficient [by itself] to justify treating those transactions as 'relevant conduct' for sentencing purposes." <u>United States v. Crockett</u>, 82 F.3d 722, 730 (7th Cir. 1996). To ensure that the aggregation rule is not abused, the sentencing court must make the required findings (explained below) "by a preponderance of the evidence." <u>Duarte</u>, 950 F.2d at 1263. In making these findings, the district court "should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relationship to the convicted offense." <u>Id.</u>

Under section 1B1.3(a)(2), the government may prove the required nexus between the convicted and unconvicted crimes in two separate ways. <u>Zehm</u>, 217 F.3d at 511. The government may show that the offenses were: (1) "part of the same course of conduct"; or (2) part of a "common scheme or plan." <u>Id.</u> (<u>quoting</u> section 1B1.3). Although these two concepts appear to be identical and Application Note 9 refers to them as "two closely related concepts,"

---

[5]     The Seventh Circuit has explicitly "cautioned" the Government about taking such action. <u>See</u> <u>United States v. Sumner</u>, 265 F.3d 532, 541 (7th Cir. 2001).

-10-

the Seventh Circuit has held that they "actually capture two distinct concepts." Id. Therefore, the Court will separately discuss each of these concepts.

Offenses that are part of the "same course of conduct" must be "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3(a)(2), cmt. (n.9). In determining whether offenses are part of the "same course of conduct," a district court should consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Application Note 9 to Section 1B1.3. In the absence of one of these factors, the government must show a "stronger presence of at least one of the other factors." Id.

Although not necessarily dispositive, "temporal proximity is a significant consideration," and courts must "be cautious and exacting" in permitting "stale dealings" to constitute the same course of conduct. United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir. 1993) (finding a two year lapse between transactions constituted a lack of temporal proximity). See also United States v. Johnson, 324 F.3d 875, 879 (7th Cir. 2003) (finding "lack[] of temporal proximity" where a year and a half separated the two criminal episodes). The gap in time between the conduct, however, must not be unintentional, such as when one of the participants was incarcerated. Cedano-Rojas, 999 F.2d at 1180. Where the court is presented with dealings which are "stale," the court must find a "stronger showing of similarity between the offense of conviction and the uncharged conduct." Id. To determine similarity of conduct, the court should "look to the identity of the participants and their roles in the events at issue, as well as the nature, structure and location of the allegedly related transactions." Id.

Here, it is uncontested that there was almost a four year gap between Cooper and Rogers' alleged transactions in 1994 to 1997 and their 2001 transactions. Assuming that Rogers gave Cooper an ounce of cocaine in the summer of 1997, the two did not transact any drug deals until April of 2001. Therefore, this Court finds that, based on <u>Cedano-Rojas</u> and <u>Johnson</u>, the alleged related transactions lack temporal proximity.

Nevertheless, as explained above, the Government may still show that the transactions were part of the same course of conduct if it can make a "strong showing of similarity between" the 1994-97 transactions and the 2001 transactions.[6] The Government, however, has not met this burden. Although Cooper and Rogers were involved in both sets of transactions and the transactions all involved the purchase or sale of cocaine powder or crack, this Court finds that Rogers' and Cooper's roles as well as the nature and structure of the transactions are different from the offense to which he has plead guilty – Counts 12 and 13. In 1994-97 Rogers' and Cooper pooled their money to purchase and then sell cocaine.[7] In April 2001, however, Cooper went to work for Rogers to deliver cocaine to Rogers' customers, in exchange for $500 a week.

---

[6]     The Court notes that the PSR is void of any discussion of section 1B1.3(a)(2)'s factors.

[7]     In making this factual finding, the Court, at this stage of the proceeding, finds that Coopers' proffer regarding the 1994-97 transactions to be more credible than Rogers. In making this determination, the Court notes that Rogers' statements contain several inconsistencies. Also, in his initial proffer sessions, although Rogers gave a detailed and broad description of his drug operations, other than a single transaction in 1997, he did not initially implicate Cooper in any of his drug dealing from 1994 to 1997. Not until Rogers was interviewed a year later, did he implicate Cooper in a broad range of conduct in 1994-97. Moreover, the Court notes that in Cooper's proffer, although he had a different description of their roles, he admitted to a greater quantity of drugs than Rogers. It seems inconceivable to this Court that Cooper would lie about describing him and Rogers as partners, while implicating himself in such a high quantity of cocaine.

Accordingly, this Court finds that the 1994-97 transactions and the 2001 transactions were not part of the same course of conduct.

Somewhat similar to the course of conduct factor, under the second prong of section 1B1.3(a)(2), offenses constitute part of a "common scheme or plan" if they are substantially connected by at least one common factor, such as "common victims, common accomplices, common purpose, or similar modus operandi." Bacallao, 149 F.3d at 719 (quoting section 1B1.3(a)(2), cmt. (n.9)). After carefully reviewing the evidence, this Court finds that the Government has failed to present sufficient facts to show that the 1994-97 activity shared a common purpose or similar modus operandi with the 2001 transactions. As explained above, in 1994-97, Cooper and Rogers acted more like partners, as compared to the employer/employee relationship that existed in 2001, when Cooper worked as a deliveryman.

### C. Reasonably Foreseeable Acts

In addition to direct acts by the defendant, section 1B1.3(a)(1)(B) provides that the sentencing court "shall" consider "all reasonably foreseeable acts" taken in furtherance of the "criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with, whether or not charged as a conspiracy." In cases involving a scheme to deal drugs, the defendant is "accountable for all quantities" that he was "directly involved" with and "all reasonably foreseeable quantities . . . within the scope" of the scheme. Application Note 2. The defendant, however, should not held accountable for drugs "sold prior to the defendant joining the conspiracy." Id. In determining what conduct was reasonably foreseeable, the sentencing court should examine the "scope of the criminal activity that the particular defendant agreed to join."

Id. In making this determination, the "court may consider any explicit or implicit agreements fairly inferred from the conduct of the defendant and others." Id.

Here, although not explicitly stated in the PSR, for this Court to increase Cooper's base offense level to a 38, this Court would have to find that it was reasonably foreseeable that the Rogers' conspiracy would be accountable for at least 150 kilograms of cocaine and/or 1.5 kilograms of crack within the two month period of time – April to May of 2001 – when Cooper is alleged to have been part of the conspiracy.[8]

After closely reviewing the evidence, this Court finds that the above quantities were not reasonably foreseeable to Cooper when he allegedly joined the criminal enterprise in April of 2001. This determination is based on the fact that Cooper's role was that of a delivery man, who delivered two to four ounces of cocaine on several occasions over less than a two month time period. Although Cooper admitted that he was present with Rogers on several occasions when Roger made sales or cooked cocaine into crack, it does not appear that he was intimately involved in the scope of the operation. For example, although the Government's wiretap captured over 3000 calls, it only picked up four calls between Rogers and Cooper.

---

[8]     In finding that Cooper's participation with Rogers ended in May of 2001, this Court is again, as explained above, crediting Cooper's statement over Rogers' proffer. In addition to the factors discussed above, the Court finds Cooper's statement more credible because of the fact that other than one wiretap intercept from jail, no other calls were intercepted from Cooper to Rogers after Cooper was arrested in May of 2001. Moreover, given the lack of transactions between Rogers and Cooper from 1997 to 2001, this Court cannot find that Cooper joined the conspiracy between 1994 through 1997.

Accordingly, this Court SUSTAINS Cooper's objection to the PSR assessing him an additional 12 levels for other relevant conduct and finds that Cooper's base offense level should be a level 26.[9]

## II.  Enhancement for Possession of a Dangerous Weapon

Cooper also objects to Probation assessing him a two level enhancement for possession of a firearm, pursuant to section 2D1.1(b)(1), which provides an enhancement if the defendant was in possession of a "dangerous weapon." Application Note 3 to section 2D1.1 states that the court should apply the adjustment "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The note goes on to give an example of an "improbable situation" – "if the defendant was arrested at his residence [and] had an unloaded hunting rifle in the closet." Once the government shows by a preponderance of the evidence that the dangerous weapon was possessed "during the relevant period of drug activity," the defendant then has the burden to show that "it was clearly improbable that the gun was connected to the offense." United States v. Martin, 287 F.3d 609, 617 (7th Cir. 2002). The government does not need to show that the defendant used the weapon in the commission of the offense, only that he possessed it during the relevant conduct. United States v. Johnson, 227 F.3d 807, 814 (7th Cir. 2000).

Here, upon his arrest in December of 2001, the police found a loaded .357 handgun

---

[9]     Although this Court finds that Cooper should not be held accountable for the other relevant conduct alleged by the Government, the Court is not making a finding as to whether Cooper actually committed these alleged acts. This determination should be made based on the full scope of the evidence at trial on the conspiracy and other counts currently pending in the Superceding Indictment.

underneath Cooper's bed in his apartment. The police also discovered distribution quantities of crack cocaine and marijuana. Based on this combination, the Court finds that the Government has shown by a preponderance of the evidence that Cooper possessed a dangerous weapon "during the relevant period of drug activity." Martin, 287 F.3d at 617. Therefore, because Cooper has not shown that it was "clearly improbable" that this handgun was related to his offense, the Court OVERRULES his objection to the PSR on this issue.

## III.   Minor Role Objection

Cooper also objects to Probation's refusal to give him a two level departure for being "a minor participant (courier) in the alleged concerted criminal activity with Rogers." Guideline section 3B1.2(b) allows a court to depart two levels if the court determines that "the defendant was a minor participant in [the] criminal activity." Application Note 5 defines a "minor participant" as a participant who is less culpable than "most of the other participants." The defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to a minor participant reduction. United States v. Mitchell, 178 F.3d 904, 910 (7th Cir.1999). The court's determination "is heavily dependent upon the facts of the particular case." Application Note 3(C). "[I]n weighing the totality of the circumstances, [the court] is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." Id.

Here, because Cooper has only pled guilty to two counts of drug dealing, not to conspiracy and because this Court is not holding Cooper accountable for the overall drug quantities of the conspiracy, the Court finds that the minor participant reduction in not applicable. Therefore, the Court OVERRULES Cooper's objection on this matter.

## IV. Acceptance of Responsibility

Cooper further objects to Probation's conclusion that he is ineligible for a two level reduction for acceptance of responsibility under section 3E1.1(a). Under section 3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility of his offense," the court should decrease the offense level by two levels. A defendant, however, is not automatically entitled to a departure for simply pleading guilty and bears the burden of demonstrating his acceptance of responsibility to be entitled to reduction. United States v. Camargo, 908 F.2d 179, 185 (7th Cir.1990). In determining whether a defendant has properly accepted responsibility under subsection (a), courts look to the following factors set forth in Application Note 1 to section 3E1.1:

> (a) truthfully admitting the conduct comprising the offense(s) of conviction and admitting or not falsely denying any additional relevant conduct for which defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction . . . . A defendant may remain in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction . . . . ;

> (g) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

> (h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

United States v. Sullivan, 916 F.2d 417, 420-421 (7th Cir.1990).

Here, as explained above, Cooper entered into a "blind plea" to Counts 12 and 13. He also gave a detailed proffer of his drug dealing activity not only with respect to this case but also regarding a wide range of drug dealing not related to this case or his Co-Defendants. Therefore, this Court finds that Cooper has admitted to the conduct to which he pled guilty to in Counts 12 and 13.

-17-

Despite this admission, the Government and Probation contend that Cooper is not eligible for the reduction because he has not accepted responsibility for his involvement in the alleged conspiracy or the drugs which he was charged with when he was arrested in December of 2001, both of which are charges which are currently pending in the Superceding Indictment, to which Cooper has pled not guilty. Section 3E1.1, however, does not require the defendant to admit conduct beyond the offense. Moreover, as explained above, the Court concludes that the conduct regarding the conspiracy was not "other related conduct" under section 1B1.3, and thus, the fact Cooper did not accept responsibility for the conspiracy does not preclude him from accepting responsibility with respect to Counts 12 and 13.

Furthermore, the Court finds that Cooper satisfies factors (g) and (h). By getting his GED while incarcerated, Cooper has certainly demonstrated post-offense rehabilitative efforts. Cooper also timely accepted responsibility by promptly entering into a blind plea after rejecting the Government's Plea Agreement.

Accordingly, this Court SUSTAINS Cooper's objection to the denial of a two point reduction for acceptance of responsibility.

## V. Cooper's Revised Offense Level

After ruling on Cooper's Objections, the Court calculates his total offense level, using the 2001 edition of the Guidelines, as follows:

| | |
|---|---|
| Base Offense Level (§ 2D1.1(c)) | 26 |
| (26 levels based on the quantity of drugs in Counts 12 and 13) | |
| Specific Offense Characteristics | 2 |
| (for possession of a firearm | |

pursuant to § 2D1.1(b)(1))

Adjustment for                                      0
of Role in Offense (§ 3B1.2(b))
(minor participant)

Acceptance for Responsibility (§ 3E1.1)       -3

Total Offense Level                               25

## CONCLUSION

For the foregoing reasons, the Court OVERRULES in part and SUSTAINS in part

Cooper's Objections [349-1]. It is so ordered.

ENTER:

**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: 1-20-04